

**FILED**
DISTRICT COURT OF GUAM
**DEC 26 2018**
JEANNE G. QUINATA
CLERK OF COURT

# District Court of Guam

*******************************************************

CV — 18-00046

Complaints

SP

DR SHERIF PHILIPS

      *Plaintiff,*

*v.*

Pitt County Memorial Hospital,INC, Paul Bolin
Ralph Whatley, David Creech, Jay Salsman

      *Defendants,*

)
)
)
)
)
)
)
)
)
)

***********************************************************************************

**Fraud Upon the Court ,Grant Relief Under 28U.S.C § 1655 and Set Aside Judgement for
Fraud on the Court , Due process of law be allowed Relief of orders in violation of the
laws, Under Title 42 United State Standard 1983 ,Constitution Right and Public Trust
Action ( 28 U.S.C& 1331) , The Right- to - Honest- Service Doctrine and Vagueness
Doctrine ,Rooker-Feldman ,Doctrine , Discrimination , Retaliation and Harassment
Asking for new Trial the law of Summary Suspension had been Changed**
***********************************************************************************

1

ORIGINAL

1-Now come the plaintiff Sherif A. Philips, MD filed for Fraud upon the court, Grant Relief under 28 U.S.C , Due process of law be allowed , Relief of orders in violation of the laws, Under Title 42 United State Standard 1983, Constitution Right and public Trust Action ( 28 U.S C & 1331 ), The Right –To-Honest –Service Doctrine and Vagueness Doctrine Rooker-Feldman, Doctrine , Discrimination, Retaliation and Harassment

2- Also plaintiff filed for due process of law be allowed and further issues relief as the court deem appropriate

3-Plaintiff Sherif A Philips asked for new Trial ,Because the law of Summary Suspension had

been changed ..

## JURISDICTION

4-The District Court of Guam had jurisdiction over Local cases as well as Federal case

concerning the Constitution treaties and Federal law

A--Plaintiff is asking the Court to transfer defendant's case to the Federal Court Because of the Federal Claims and Controversies parties.

Constitution Right and Public Trust Action ( 28 U.S.C & 1331 )

B-Superior Court of Guam mishandled Plaintiff 's Federal claims ( Exhibit A ) on Dec 14,2018

### Introduction and Statement of The Case

### FACTUAL BACKGROUND

5. PCMH was a county owned hospital until 1999. It was making a profit for the county

almost $5M annually and was taken over by Dave C. McRae. He was a county

employee acting as a liaison between PCMH and the county. He leased the hospital for

$20M for a period of two years and his annual salary was $12M and he retired with a

salary of $7M. Martin General Hospital was about 25 beds which was a county hospital which

was sold for $17M. Pitt county is over 850 beds at that time and was leased for $20M?

2

6. Practice of medicine at eastern part of north Carolina is completely unsafe for the public and PCMH keeps buying and leasing more of the surrounding hospital and they are the only tertiary hospital covering 29 counties.

7. PCMH are interested for the patient load, not the patient care.

8. It is very hard to find a bed at Pitt county memorial hospital and for medical care of the patient which involves leaving the patient in the E.R. with poorly equipped hospitals without any sub-specialty support to cover their urgent needs.

9. The patients were also discharged prematurely for bed rotation.

10. PCMH controls the referral market killing any competition.

11. PCMH are after the solo practitioner.

Look for Paul Bolin deposition. He just mentioned there was no room for solo nephrologist and look for Dr. Ralph Whatley at one point he was the CEO of East Carolina real estate.

This also had significant public interest.

12. The hospital encouraged up-coding and premature discharge of the patient and doing unnecessary procedures so PCMH is committing Medicare fraud and this is also for public interest.

13. Dr. Philips opened a solo practice in nephrology and worked as a medical director of dialysis unit in Williamston and Tarboro, North Carolina in July 1995. Within a few months, Dr. Philips applied for active medical staff privileges at PCMH. At that time, PCMH was the only tertiary care facility within 29 Counties that was approved for in-house acute dialysis. The acute dialysis unit was owned and run by Eastern Nephrology Group (ENA).The acute dialysis unit had to follow Medicare rules and regulations.

In order to practice nephrology, a nephrologist must have active privileges at PCMH for continuity of care according to Medicare regulations.

14. In 1996, Dr. Philips was awarded Category IV privileges (which allowed a physician to admit dialysis patients) as a consulting physician at PCMH. However, it was brought to his attention several months later by PCMH's Chief of staff that he should not have been awarded Category IV privileges as those were reserved for members of active medical staff. Dr. Bolin and Dr. Wayne Kendrick, both members of the PCMH Renal Committee, also

3

informed Dr. Philips that he would no longer be allowed to admit dialysis patients to PCMH. (that was prior to the letter from the chief of staff)

15.     Two letters back to back from Julian Van Wright (the chief of staff at that time) states that Category IV privilege in nephrology (which mean dialysis) are reserved for active privilege staff. Also, Dr. Van Wright, DR Bolin, and Division of ECU have agreed to provide this supervision through June 12th at 5:00 PM and take over my patient care when they require admission.

16.     Meeting with Paul Bolin asking for coverage and to help Dr. Philips obtain active privileges at PCMH. Dr. Bolin agreed about backing up his application and provided coverage to his patient when the hospital is unable to reach him. Dr. Bolin agreement was forwarded in a letter to Katherine Gastin on 09/30/1996 and also to Julian Van Wright on 08/20/1996.

The hospital forced DR Philips to move his practice to Greenville and had ECU coverage.

During that meeting, Dr. Bolin asked DR Philips in return to sign a written letter to the state of NC to help Dr. Bolin out to open ECU out- patient Dialysis unit.

17.     Letter from Joshua Schwartz  (the chief of staff on 1998) dated 02/23/1998 questioning where was Dr. Philips primary site of practice followed by telephone conference calls with Dr. Philips. Dr. Philips explained in detail his nature of practice and his dialysis patients .Dr. Schwartz agreed about re- appointment from 1998-2000.

18.     Another letter from Marcus Albernaz (the chief of staff on 2000). Dr. Albernaz had the same question about the location of Dr. Philips primary site and warning that Dr. Philips must provide satisfactory documentation prior to March 17, 2000 evidencing that Pitt County is Dr. Philips primary practice site or Dr. Albernaz will terminate Dr. Philips privilege at PCMH or re-apply for consultation privilege. (No dialysis)

19.     Meeting with credential Committee on May 2000 proving that Carolina Kidney was the only office Dr. Philips owned  in Greenville which was Dr. Philips primary site approved by Medicare and 85 percent of Dr. Philips time providing care for inpatient or outpatient was spent at Pitt county.

Also DR Philips explained in detail the nature of practice Dr. Philips had also active privileges at Martin General and Dr. Philips was a medical director of 3 dialysis unit Williamston, Tarboro and NewBern. Dr. Philips had dialysis patients at Greenville dialysis unit, Pamlico Dialysis unit, Plymouth and Windsor dialysis units. PCMH was also oriented regarding the number of dialysis patients Dr. Philips had in each unit

4

Dr. Merrill provided DR Philips with a letter Dated 02/15/2000 Stating that DR Merrill's willing to cover DR Philips patient either in patient or outpatient at PCMH on a scheduled or non-scheduled basis whenever Dr. Philips was not available.

The credential committee approved DR Philips for reappointment in 2000-2002 for active privilege.

20.    -On May 2000, Patient A,1 (MR Ward )a patient at a free-standing dialysis unit operated by Total Renal Care in New Bern, North Carolina, bled out as he was being dialyzed. The equipment and its alarms malfunctioned due to technician error. Dr. Philips was the medical director for the dialysis unit, having administrative duties but no clinical care duties. When Dr. Philips arrived at Patient A's bedside, all appropriate and necessary steps had been implemented by the first responder.   Patient A was then rapidly transported to a nearby emergency department.  Patient A subsequently died.  Although Patient A's family sued Total Renal Care and Dr. Philips, as medical director, along with many other defendants, for acts and omissions related to that event, Dr. Philips was released from that suit without payment of monetary damages by him personally, although some minimal litigation expenses were paid on his behalf to settle the case. After Dr. Philips dismissal from the lawsuit regarding Patient A, Total Renal Care summarily suspended Dr. Philip's privileges at its Edgecombe and Martin County facilities based on his alleged failure to maintain records in accordance with those facilities' standards.  Dr. Philips disputed the facilities' findings (and suspected the suspension was related to his refusal to admit liability in Patient A's case).  Dr. Philips clinical privileges were subsequently reinstated.  Four years after the death of Patient A, Dr. Philips entered into a Consent order with the North Carolina Medical Board related to events surrounding Patient A's death.  However, on their face, these findings appeared to blame him for his failure to render assistance to Patient A despite his lack of clinical duties relating to Patient A and the fact that the patient was receiving all appropriate life-saving assistance. Because these findings were not accurate but were being used against him by PCMH, Dr. Philips then reconsidered his agreement to the Consent Order and asked for an appeal for NC board medical decision.  In June 2005, the medical board terminated the consent order prior to the PCMH board of trustees decision for active suspension for 31 days.

21.    Ward Case North Carolina Medical Board

Dialysis is a nursing procedure.  The role of the nephrologist is to write the dialysis orders. No physician is required to be at dialysis center 24/7. Mr. Ward was not DR Philips patient. Mr. Ward was ENA patients. It is well documented that Mr. Ward primary nephrologist rarely rounded on the patient for more than 3 months. The day before the event, Mr. Ward  was

5

evaluated by the surgeon and it was well documented that the patient was confused. The patient also had a history of pulling his needle more frequently and nothing done by MR Ward primary nephrology like soft restraints or family close observation or more nurses attention.

It was well documented from the nurses note that MR Ward was depressed not happy with his physician and MR Ward wanted to end his life. DR Philips was not medical director at that time and his contract expired on Feb 2000. DR Philips was there by chance to clean his desk and to do the Last PD clinic because the unit was sold to Fresenuis company. It seemed to DR Philips that the patient pulled the needle and the machine alarmed. The technician disalarmed the machine without checking the line and drained out his blood to the floor. Mr. Ward blood count on the same day was 8 and at the ER it was 4. Mr. Ward lost 4 grams of blood on the floor. The technician called ENA nurse practitioner whom responded at this scene and BCLS was performed. The patient stayed at the unit for 3 Minutes after that EMS was at the scene and took over the patient and transferred him to ER. Dr. Philips was not at the treatment room and no one called Dr. Philips. Dr. Philips responded by himself and Dr. Philips was next to the patient.

Dr. Philips found BCLS in progress. Dr. Philips was unable to do ACLS because the unit did not have EKG machine. Dr. Philips was only present for 2 cycle of CPR and EMS was there. Dr. Philips asked Lola the nurse to stick MR Ward graft and 1 liter bag of Saline was given. If Dr. Philips did nothing then why did the nurse practitioner thank Dr. Philips for helping him out during the resuscitation?

At the ER, the patient gained his BP 140/80 and HR 125 .But his blood count was 4.

During the event no one was aware what happened to Mr. Ward. (Look for the discrepancy between the death certificate which was written by DR Montero). The cause of death was cardiogenic shock which was done at scene and later on death notification to Medicare was bleeding at access.

This event was followed by Malpractice law suit which Dr. Philips had been cleared off.

Also Dr. Philips had been investigated by the NC Medical Board and the agenda was if there was cross coverage between Dr. Philips and ENA and the role of the medical director.

Davita suspended plaintiff's privileges at Williamston and Torboro unit as a result of plaintiff's testimony in the settlement hearing. Plaintiff was exposing Davita's mistake that the technician disalarmed the machine without checking the alarm. This was the reason why patient lost his life. Plaintiff received a phone call during the settlement from the vice president of Davita and their medical director in the presence of Mike Allen, plaintiff's

6

lawyer, they threatened plaintiff to change his testimony or they will retaliate because they don't consider him a member of Davita's family. They summary suspended plaintiff's privileges. Plaintiff asked for a hearing thus his privileges were re-instated and he got settlement for monetary damages for his breach of contract as a medical director of Davita's unit.

Feb 2003

Letter from NC Medical board request for investigation about the death of William Saunders. PCMH reported the case to the medical examiner by member of ECU pulmonary that Dr. Philips gave a medicine to the patient Fentanyl and Versed for the second time when the patient had severe reaction to a previous drug in the past.

Dr. Philips used Mike Allen the same lawyer for the Ward case to explain that Dr. Philips did not give any medication and Dr. Philips did not do any procedure for this patient. For no apparent reason Mike mentioned the Ward Case.

On August 2003, I got cited with the board for the Ward Case. At that time one of the members of the Board was ECU Surgery Walter Posse.

May 2004

Mike Allen and over-writing from the mal-practice insurance convinced Dr. Philips to sign the consent order telling Dr. Philips that Dr. Montero already signed a consent order on 2003 and nothing happened to him.

Dr. Philips was told nothing will affect his practice and the Mal -practice insurance is not willing to spend any more money on the Ward Case.

After that, Dr. Philips had been investigated by PCMH, Martin General, CIGNA and PA medical Board.

DR Philips asked NC Medical Board for a hearing when the NC Medical Board offered to lift the consent order and terminated after only 8 months and cleared DR Philips name.

22.    On 2003

Incident report was inserted in Dr. Philips file. DR Philips was not aware about it.

For the patient Higgs Dr. PHILIPS admitted a patient at the PCMH without examining the patient and the patient was brain dead.

7

PCMH was not aware that this patient came from Martin General ER and the patient had seen there by DR Philips and DR Philips transferred the patient to PCMH per family request. One member of the ECU pulmonary gave this information to Whatley.

23.     Unbeknowst to Dr. Philips, in early 2004, PCMH began to raise the issue of whether Dr. Philips was physically examining his patients at PCMH.  This accusation emanated from his economic competitors or their practice partners.  These accusations also occurred in the wake of continuing criticism of Dr. Philips for treating Medicare patients and other patients without financial ability to pay for treatment at PCMH just as he would any patient- according to their medical needs and regardless of their ability to make financial payment.  For example, Patient B was a 34 year-old patient of Dr. Philips who was in PCMH as an inpatient for six months in 2002.  When the patient was still at PCMH, Bolin (who was head of nephrology at PCMH and a direct competitor of Dr. Philips) contacted Dr. Philips by telephone and told him that Dr. Philips needed to "pull the plug" and Patient B.  Dr. Philips was shocked that Bolin could make such a suggestion and told him that he could not and would not do such a thing. Other situations like this existed through the years and provided PCMH, Bolin, and Whatley with motives for eliminating Dr. Philips from the medical staff, in addition to the anticompetitive motives that already existed due to the nature of their respective practices. Thereafter, PCMH, Bolin, and Whatley began to manufacture complaints about Dr. Philips.  In January 2004, Whatley and PCMH's Risk Management Department asked nurses who did not work with Dr. Philips on any regular basis to "observe" his interaction with patients. Although Dr. Whatley was fully aware that the renal unit at PCMH was at 3 south.

24.     Whatley with help of Katherine Gaston, Vickie Haddock and Clyde Brooks to recruiting a nurses to overshadowing DR Philips from FEB 2004 till April 2004 .Their allegation was they identified 4 patient .Even DR Philips did enter the patient room .

25.      Whatley did an investigation without approval from the executive committee. Even Whatley with the help of Vickie recruited nurses not from the dialysis unit or 3 South the renal floor. Vickie chose nurses supervisor from 2 north and 3 east (not the primary nurses on the floor).

26.     Paul Bolin letter on June 2004 for initiation Peer review with Clyde Brooks as a part of DR Philips re-appointment for 2004.Because DR Philips mentioned in his application the Mal practice law suits with MR Ward.( second Peer Review )

27.     E -mail between Katherine Gaston and Whatley and recommendation of summary suspension prior to the corrective action.

8

28.     Meeting on July 2004 with Whatley and Barrier regarding the infectious disease protocol.

Dr. Philips explained in detail what Dr. Philips was doing and Dr. Philips was using Dr. Rumley.  As a consult for antibiotic management (not ECU physician).(Third Peer Review)

29.     The following week meeting  on July 23, 2004 with Whatley, Barrier and Vickie Haddock. Their allegations were not examining the patient and Whatley insisting DR Philips was doing Medicare fraud. Dr. Philips handed his office key to Vickie to evaluate his billing record during his vacation where DR Philips said "no way".

I'm a private physician. The hospital gave no patient to me all through the years at PCMH. All of these patients are coming from my clinic and I have to run it by my lawyer first.

30.     Communication between Mike Allen and Vickie for letter dated 8/31/2004 and 9/09/2004 regarding my billing record prior to the Peer Review.

31.     On August 2004

Whatley wrote to Barrier again that Whatley reviewed the medical record for many hours and DR Philips explanation did not stand.

Whatley also mentioned about NC medical Board consent order and Whatley asked for summary suspension of my privilege.

32.     August 30, 2004

Meeting held to discuss issues and corrective actionWhom was in that meeting? It was before the request of investigation which was done on Sept, 2004

This is the Agenda from 1 to 5

ISSUE #1

Documentation of seeing patients, physical examination, lungs, clear, etc. when the examination was not actually performed. This issue has two parts: One is whether he billed for the patient for that or not and the Risk Management/Legal Office is looking into that with his attorney.  They will then determine whether they will report this as a Medicare fraud issue or not.  The second, regardless, of whether they actually that to Medicare is that is clearly substandard care and needs to be dealt with by the chief of service.

9

## ISSUE# 2

"Our chest pain admission who subsequently died". Case reviewed by several parties. Conclusion: Non-issue.

## ISSUE #3

Reprimand by the NC Medical Board: Consent order May 21, 2004. From failure to provide help while on duty as medical director at Total Renal Care in New Bern, NC (reported by NCMB to the NPDB and HIPDP)

## Issue #4

Suspension from medical staff and/or dialysis units in Williamston and Tarbero: The course of action on these two actions also is left to Drs. Bolin and Whatley. Again, either peer review or correction action may be initiated on the basis of these suspensions or revocations, but the actual facts leading to these suspensions are necessary for further judgment. Unable to get an official response from facilities in Williamston or Tarboro about these suspensions.

## Issue #5

QUESTIONABLE APPROPRIATENESS OF DIALYSIS(3) Cases reviewed by Chief of Service. Conclusion Non-issue.

August 30. 2004 Letter received by the Chief of Staff from the Chief of Service requesting correction action based on #1 and #3 above.

August 30, 2004: Meeting held to discuss issues and corrective action.

33.     Letter to appear in front the executive committee. Dr. Philips had no idea what for.

Dr. Philips had to invite 2 lawyers with him Mike Allen (who handled the NC Board) and William Simpson (the other lawyer dealing with dialysis matter).

PCMH Lawyer gave us time to appear at 6:30PM after they had their supper for 2 hours PCMH let us in.

Whatley started his allegation about all Dr. Philips trouble start in on 1998 with the brain dead patient on bed 12 MICU and Whatley was recruiting nurses from different floor that Dr. Philips did not examine patients and Dr. Philips billed for it. DR Philips denied his claim and Dr. Philips also mention how bad and sour relationship between DR Philips and Whatley. It started prior to Dr. Philips privileges at PCMH. When Whatley mis-diagnosed one of Dr.

10

Philips patient with lung abscess and the right diagnosis was lung cancer. Later on the patient was found to have lung Cancer as Dr. Philips diagnosis.

The executive committee approved to proceed with peer review.

34.    On October 2004

Whatley appointed member of the Ad Hoc committee to investigate the allegations. According to PCMH By- law the one that initiated the investigation especially if he asked for summary suspension should not be involved in the corrective action.

Whatley also elected Dr. Brown as chair of Committee and Dr. Brown was ECU pulmonary like Whatley. Whatley admitted to contacting Dr. Brown prior to the meeting and told her his concerns. The second member was Christino married to ECU nephrology.

Whatley forgot the definition of direct economic competition with the practitioner

physician who practices with the same specialty and sub specialty which is considered in direct economic competition. Brown is internal medicine / Pulmonary. Christio is internal medicine / Cardiology and Turner is internal medicine.

Larry Graham was there as the hospital lawyer. Larry do not allow Dr. Philips lawyer to be there. Larry said in his deposition that he was there to make sure the committee followed the by-laws.

But Larry Graham was the one running the show and asking all the questions. When Dr. Philips mentioned that he will appeal to the NC medical Board, Larry advised the committee the consent order were not subject for appeal.

Before the Ad Hoc committee, Dr. Philips received a letter from Larry Graham firm on October 10, 2004 about the four issues the committee will review. Call coverage was not included in it.

All of the sudden without any notification, Dr. Philips was informed that call coverage was added by Whatley to the agenda through a letter without approval of the executive committee. No record was made by the committee as requested by PCMH BY-LAW. The only record was made by Larry Graham.

35.    On November 15, 2004 DR Philips met with MEC they told to meet at 6:30pm. PCMH did the same thing. They had supper after every one left. Except 9 members Whatley and Brown was there. They did not accept the recommendation of the Ad Hoc committee. They enforced suspension /suspended for 6 months.

11

36.     Section 3 composition of the fair hearing

Physician who practice in the same specialty / sub specialty are consider direct economic competition Like Patel internal medicine / cardiology was not supposed to be there. DR Patel was trained at ECU program under Bolin and Whatley. Dr. Patel is married to ECU internal medicine physician and was working under Whatley.

During the meeting DR Patel acted unprofessionally. There are too many objections by Mike Allen to his behavior.

The hearing committee met up to 6 times. The hearing committee found out the discrepancies between the nurses testimony at least 2 of them.

They requested a 6 month review of Dr Philips way of practice. No correction action was requested. But they added and changed in the agenda that Dr. Philips date and time his notes does not match the requirement for PCMH. DR Philips always dated his notes and DR Philips timed it if DR Philips was seeing the patient for second time as required by Medicare. Dr. Philips did not have any problem with his medical records.

The hearing committee does not have an access to the medical record. The only note the hearing committee had involved the four patients was provided by Mike Allen.

They were not experts in medical records and they did not compare Dr. Philips notes with somebody else as required by the law.

No explanation was given to Dr. Philips why Dr. Philips had to go to ECU Physician help Center. Like in the past, Larry Graham wrote the recommendation.

During Patel deposition, he admitted he was not aware about the recommendation he just signed it. It seemed like the hearing committee was just a frame. But the recommendation was coming from somewhere else!!

During the 6 meeting with fair hearing committee, Dr. Philips and Mike Allen was asked to leave. The fair hearing committee left behind Larry Graham. Also an application for reappointment was given to Dr. Philips by Mike Allen for re-appointment for 2005 -2007 As matter of fact, Dr. Philips already had privileges from 2004 -2006.

37.     The recommendation was approved by EMC except agree about my request to go to NC physician help center.

38.     On 02/17/2005 PCMH hired David Creech prior to the law suits to take over the Peer Review.

12

39. Larry Graham recommendation with Dr. Philips right to appeal the decision of MEC to the board of trustees because this may interfere with Dr. Philips reappointment application and Dr. Philips was also going to get more punitive sanction.

We agreed because nothing to appeal no corrective action was taken against Dr. Philips.

40. The Board declined the recommendation of the EMC and forward the case to the committee of 4.

The Committee of 4 supposed not be a PEER REVIEW COMMITTEE because neither DR Philips nor his lawyer was invited to attend. The committee of 4 never read the fair hearing transcript. And the committee of four made their decision behind close door in relation to 2 notes ( Islami v. Covenant Medical Center ) The committee of 4 made their recommendation of 3 month suspension and 31 day are active. No reason was given for DR Philips for active suspension.

41. The board of trustees approved the recommendation and made a final decision.

Section 11. Final decision by Governing Body (PCMH bylaw)

 b .No practitioner shall be entitled as a right to more than one hearing and one appellate review on any matter which shall have been the subject of action by PCMH executive committee or by the governing body or by a duly authorized committee of the governing body or by both. This means the decision of the board of trustee is not final because DR Philips still had one more chance for the appeal.

No reason was given to DR Philips why DR Philips had been suspended. It was the same recommendation of the EMC except for the suspension.

The report to National Data Bank is related to incomplete medical record. According to the law any suspension related to incomplete medical record the hospital had no right to reported except after the 3rd time.

42. Following the 1st Federal law suits.

8/09/2005 leadership committee attended by David Creech where Creech was talking over the peer Review.

One week after DR Philips came back from suspension Dr.Philips was at support building by chance to have coffee. Dr. Philips over- heard a conversation between Ernest W Larkin ( the hospital medical director and the clinical pathologist of PCMH) and Paul Comnitz ( one of the NC MEDICAL Board member)

13

Paul was asking if it is true that one of the nephrologist was suing the hospital. Ernest answered do not worry, "We are planning to get rid of him". This happened prior to the leadership Committee that Creech attended.

43. DR Philips was asked to provide his daily schedule in 3 months in advance and give it to PCMH by Larry Graham. David Creech hired a private investigator on his own not approved by credential committee to follow Dr. Philips up to 45 days.

44. On 11/01/2005 Creech meeting with the medical staff leadership committee re- DR Philips further corrective action.

45. Last week of November 2005 Dr. Eric Lindbeck chair of the credential committee requested investigation. He was the same physician that approved DR Philips coverage and Dr. Philips primary office in 2000.

46. Following the request from Lindbeck and the recommendation of the committee of 4. Dr. Julian Vainwright was the acting chief of medicine (Julian is not qualified for that position according to their by-law because he is a radiologist) also Van Wright was involved before to take over Dr. Philips dialysis privilege on 1996. Van Wright consulted with chief of service (who is he?) and another physician regarding possible need for summary suspension.

47. Letter on 11/28/2005 from lars Larson for activation of the 59 day of suspension and Larson called my office by 1:00PM and said to Dr. Philips by 5:00PM, "You are suspended for 59 days." There was no reason given to DR Philips. There was no chance to contact Dr. Philips patients either to move them to other physician or other hospital.

48. The following day 11/29/2005 Larson request for summary suspension. It seemed to Dr. Philips activation of the 59 day suspension and summary suspension was the same reason for DR Philips was outside the county while DR Philips had patient on dialysis at PCMH.

Summary suspension - they titled DR Philips as a dangerous physician

Summary suspension are permitted under statute in case of emergencies involving imminent danger to the health of any individually FOLLOWED BY APPEAL.

PCMH summary suspension Dr. Philips for non-professional review activity (Ehlen v St cloud hospital).

49. If summary suspension is ordered Dr. Philips go straight to EMC.

Dr. Philips lost his chance to meet with Ad Hoc committee which was run by Dr. Fogarty, another internal medicine pulmonary.

14

50.     No one was listening to Dr. Philips explanation for coverage at EMC meeting where there was over 60 physicians that attended and this was normal executive committee in an executive session.  At first, Larry Graham announced to everybody that Dr. Philips already filed a law suits against PCMH and members of the staff at PCMH.

Dr. Kelkaring the infectious disease physician was outside the meeting and they had to call him in. Dr. Kelkaring was not aware about the allegation. The ID protocol was run by Paul Cook not Kelkaring.

They provided DR Philips a letter not signed by Merrill.  In that letter, Merrill stated that he wrote this letter per the request of Larry Graham.

EMC approved the summary suspension

51.     On 2003

The bylaws were changed to strict practices to certain groups to acquire more patients to ECU and increase hospital revenue.

For active staff privilege, if you have patient at PCMH you had to be at Pitt county all the time 24/7 or you have a written agreement of coverage by physician or groups with same specialty or same qualification. Dr. Philips had between DR Philips and ECU nephrology as written agreement in his files.

PCMH approved his coverage sign by both Bolin and Whatley till 2004 and on 2000 Dr. Philips added a second layer of coverage with Dr. Merrill.

During the renal committee in late 2004 DR Philips was denied exception. But Bolin promised to continue coverage through the fellow which Bolin denied that in his deposition. Bolin promised to forward all the renal committee minutes meeting to Karin and Bolin never did.

52.     Call issues

DR Philips was asked to provide to PCMH his call schedule on monthly basis 24/7

Then DR Philips was asked to provide his Daily schedule after the letter dated 6/22/2005 which DR Philips did.

The hospital had written agreement on Dr. Philips application and Dr. Philips file that DR Philips had double coverage between Merrill and ECU nephrology.

No patient complained nor nurses addressing DR Philips availability. The corrective Agenda on August of 2004. NO DIALYSIS issues

15

*The state law*

NC Medical act chapter 90 Page 11 of 379 Failure to respond within a reasonable period of time and I reasonable manner as determined by the board to inquires from the board concerning any matter affecting the license to practice medicine.

*Federal law EMTALA*

No physician is required to be on call at all time. As a corollary to immediately preceding point, CMS reiterated existing interpretive guidance that no physician including sub specialist is required to assume 24/7 day coverage ,regardless of number of physicians on staff specialty. Rather ,written policies and procedures must adapted for when a particular specialty is not available or when the on call physician cannot respond for a reasons beyond his/ her control.

Also Simultaneous Call Physician with the exception of staff at critical access hospital can be on call simultaneously at other hospital to maximize patient access to care. When using this coverage approach. The hospital involved must have policies and procedures to follow when the on call physician is not available to respond because he has been called to the other hospital to evaluate an individual.

On 2000 Dr. Philips explained that DR Philips provide call coverage at PCMH, Martin General and 7 dialysis centers and the credential committee approved his coverage and his practice.

After hiring the private investigator, DR Philips was outside the county On Oct 5,14 and 28 for very limited time. Dr. Philips was responding to emergencies as documented two of his three patient that Dr. Philips saw were admitted to PCMH.

DR Philips was treated differently. No other physician was asked to provide the hospital with either call schedule nor daily schedule. Who was covering Merrill? Dr. Philips never wrote a letter to Merrill for coverage.

Whatley said Merrill was covered by ECU. Bolin said Merrill was covered by physician extenders means a nurse or the hospitalist coverage.

The hospitalist program was available to everybody on 2003. Why did PCMH decline this service to Dr. Philips and Dr. Philips was having 2 physician extenders at that time?

The dialysis unit was owned by ENA and had to follow the Medicare rules. This the medical director of the unit had to provide coverage in case of emergency (Ward Case).

Dialysis is a nursing procedure .Bolin deposition states that is not required for a physician to be at the dialysis unit at all the times while the patient receiving dialysis.

16

From Patel deposition call start at 5:00PM Every physician is responsible about his patient till 5::00PM.Regardless of the daily schedule the nurses is going to call his/her physician. Not the covering physician. If Dr. Philips cannot handle the call, he always calls somebody else. The hospital already has a code team in place which is supposed to respond to any patient in need for urgent interference and they are supervised by critical care physician and fellow 24/7.

When a patient comes after hours and patient needs STAT dialysis the nephrologist cannot do anything without a nurse. All Nephrologists need a nurse to initiate dialysis.

Three of the acute dialysis nurses live outside PITT County and were talking call.

Who was covering Merrill when Merrill was pulling his boat from the marina? Merrill was never asked for his daily schedule. Neither Whatley or Bolin were aware that Merrill had multiple county practice like Dr. Philips.

There were many solo Cardiologist, Gastroenterologists, and oncologists that were never asked for daily schedule or coverage.

53.     After the decision of EMC

PCMH report DR Philips twice to North Carolina Medical Board and the Data Bank for the same reason back to back.

All of these reports were done by Kathryn Gaston without any approval with Chief of staff according to their by- law. Later on, this report was withdrawn and reported again by a different person, Kelley (The quality control). But the content was the same.

54.     On December 14, 2005

Dr. Philips received a letter from Fresenius Medical center (ENA are the medical director of all their unit). Fresenius mentioned DR Philips privileges at PCMH was summary revoked and this revocation of privilege is considered to be permanent.

PCMH is the only hospital in the service area which is an approved renal care facility. As Dr. Philips was no longer an active member of the medical staff of this hospital,the governing bodies of these Fresenius owned and operated dialysis facilities find it necessary to revoke DR Philips Medical staff Privilege effective December 21, 2005

Thus, another report sent to the Data bank.

55.     On December 22, 2005 Dr. Philips gave notice to PCMH for appeal.

17

On Feb 27, 2006 formation of the fair hearing Committee.

56.     On Marsh 2006 meeting with NC Board as the result of summary suspension. The Board hearing committee cleared Dr. Philips up from the PCMH allegation. NC Medical Board told Dr. Philips frankly deal with your problem with PCMH.

The only thing NCMB asked about is the ID protocol recommendation. NCMB asked DR Philips to provide them with 5 Medical records. Dr. Rumley as consult for ID and 5 other medical record without Dr. Rumley. Dr. Philips was promised to let the chart review by any other physician or group in Raleigh area away from Pitt county university health system.

57.     On April 11, 2006- May 15, 2006, May 16,2006 and October 2, 2006

The fair Hearing Committee met and heard evidence

During one of this meeting Larry Graham refuse to let DR Philips cross exams DR Kelkaring( ID DR). Following the May 16/2006 hearing, the committee through Larry Graham notified Dr. Philips that they heard enough evidence and had no need for additional testimony. Larry Graham retained the services of an attorney William R.Purcell II of the firm of Purcell &Griswold, LLP from Scotland neck of NC to write the hair hearing recommendation. It did not match with the minutes against what was written on PCMH By-laws.

58.     Their recommendation went to the EMC and BOARD of trustee

On December 29, 2006 I was permanently revoked from PCMH

On Feb 2006 DR Philips lawyers received a letter from NC Medical Board offering to them another consent order without knowing DR Philips allegation. Even NCMB refused  to release the name of the expert witness. Dr. Philips refused to sign and ask for a hearing. DR Philips learned his lesson from the Ward Case.

59.     On March 2006 Dr. Philips filed the second Federal law suits.

60.     From 2006 / 2007 DR Philips lost his practice .DR Philips had no income .DR Philips was working as a primary care provider in his office .DR Philips had more than three lawyers fees, 2 for the Federal law suits and one for NC Medical BOARD.

PCMH kept in touch with the NC Medical Board even on 2007. PCMH was recruiting the expert  witness from one of their hospital (Dublin General Hospital). When we found out about him, he resigned from this hospital which he had privileges till 2008

61.     2007 Dr. Philips moved to Guam. DR Philips lost all of his patients and left his family behind. Although he left North Carolina, PCMH with the help of Creech, made it hard for Dr.

18

Philips to find any Jobs through Creech report to West Virginia Medical Board. Miss Medical Board, Texas Medical Board and also to Guam Newspapaer.

## Legal Battle

62.     On 29 July2005 , Plaintiff filed a complaint in United State District Court for Eastern District of North Carolina bearing file No. 4:05-CV-97-F (3) ( referred to herein as " Philips 1 ") . In Philips 1 , plaintiff asserted claims arising out of (1)- active suspension for 31 days of defendant medical staff privileges without any reason.

 (2)Fraudulent report to Data bank for none -professional review issues and NC Consent order was terminated prior to the report . The report was done by Kathryn Gastin without any reviewable by the chief of the medical staff and the chief of service.

63.     According to NC Medical Act Chapter 90 page 15 of 379

A hospital is not required to report the suspension or limitation of a physician privilege for timely complete medical records unless the suspension or limitation is the third within the calendar year for failure to timely complete medical record.

64.     The district Court dismissed plaintiff's Section 1981 and 1983 claims without summary judgment motion as none compliance with the discovery.

65      PCMH Lawyers asked plaintiff  to produce true and correct copies of any and all billing records for years 2000 through 2005 for any and all patients defendant had seen and treated either at PCMH or at any other facility

a - Billing record not relevant to the issues or claims raised in this law suits and not reasonably calculated to lead to the discovery of admissible evidence

b- a fishing expedition for information not relevant to this suit

c- overboard to the extent that the request was requested was for billing records for patients at facilities other than Pitt County Memorial Hospital when such other facilities are not parties to or otherwise connected to this suit or the issues ,claims or defenses raised in it.

d- PCMH claims that defendant wholesale practice were specifically the subject of the

corrective action against defendant f which was inaccurate.

e- Plaintiff was not an employee and never used PCMH billing service. PCMH had no

19

dominion over Plaintiff office billing records. PCMH had nothing to do what so ever with the allegations made or the defense raised in the lawsuit.

f- This wholesale request to fish for some evidence that paintiff engaged in wrongful billing practices in order to bring further pressure against plaintiff for seeking legal relief from the wrongful peer review

g- Discovery devices cannot be used to fish for information or exert improper pressure on

party.

66.     Magistrate Judge Webb in his order asked for considering plaintiff Fifth Amendment privilege and plaintiff need to acquire relevant evidence , one possible solution would be a stay this civil action until the statute of limitations runs on all potential criminal charges as the Fifth Circuit did in Wehling 608 F2d at 1089 .

The Magistrate Judge Webb recommended that unless plaintiff produced responsive information , plaintiff's case would be dismissed.

67.     For the Court information PCMH got plaintifft wholesale billing record as an order by Honorable Judge Doughton. In the same  PCMH refused to give their billing records to plaintiff

68.     Plaintiff filed his second lawsuits in the United States District Court for the Eastern District of North Carolina ( File No. 4 : 07 - CV - 49 - F ) " Philips 2

As result of wrongful new corrective action and for non-professional review issues.

Defendant medical staff privileges was summary suspended and permanent revoked it on Dec 19, 2006.

69.     Plaintiff lawyer dropped 1981 & 1983 claims, just asking for due process as only Federal claims.

70.     Honorable Judge Fox deprived plaintiff from his constitutional right for due process affirmed by the fourth circuit. In an opinion issued 13 July 2009.

71.     All of the plaintiff lawyers filed for motion to withdraw which was granted by the lower court Judge on October 2013. Ms Meyer and Ms Zaner filed for punitive damage claims in Every Federal and State claims . If Ms Meyer and Ms Zaner felt that plaintiff'st claims were malicious or frivolous why both lawyers filed for such claims.

72.     Due to unexpected withdrawals of all plaintiff's lawyers, Plaintiff had hard time to

defend his punitive damage claim and to approve to the court that plaintiff'sclaim was not

frivolous and malicious. Motion of legal fees and Taxation was granted by lower court on July 2014.

20

73.     Plaintiff filed "Philips 4" on Feb 15 / 2015 vs multiple parties and new Federal claims. All of the Plaintiff 's claims never been litigated and was improperly dismissed in unlawful ways. Even the new defendants ( David Creech and Jay C. Salsman ) had been dismissed without any argument.

74.     On 12 August 2009, plaintiff filed in North Carolina Superior Court ( Pitt County

Superior Court File No . 09-CVS-2652).

75.     Honorable Judge Duke ordered on mediation for plaintiff case. On November 4, 2009 David Creech filed for exceptional Case

76.     Plaintiff's case was assigned to Honorable Judge Richard Doughton on Feb, 2010.

plaintiff had concerns about Judge Doughton (had discrimination claim against him prior to

plaintiff's case). Nothing done by plaintiff's lawyers.

77.     plaintiff had hard time to acquire legal representation from North Carolina, because

PCMH acquired most of the legal firms at North Carolina. PCMH Lawyers tried very hard to

block plaintiff's lawyers from appearance at North Carolina Court.

78.     As expected, Honorable Judge Richard Doughton ignored federal law statute federal laws,

Statues immunity, North Carolina immunity, privileges and North Carolina  Medical Act.

Honorable Judge Richard Doughton never wrote any orders in plaintiff's case.   Honorable Judge

Richard Doughton also granted all of the defendant   motions without any verification if lawful or

unlawful Honorable Judge Richard Doughton gave  his power to the defendant  Lawyers to  write all

orders and to create their own statutes.

79.     The defendant lawyer succeeded to put all of the plaintiff's facts as privileged and when

Defendant lawyer questioned this matter, they answered them back, " Because I said so"

80.     Plaintiff after he lost his legal representation, defendant get used to filed his motion

by  first class U.S Mail certified and addressed to Lori A. Strayer ( Trial Court Coordinator)

81.     On August 2016 plaintiff filed for noticed of appeal and requested all the records of

Summary Judgment go to North Carolina Court of Appeal ( No pending appeal docketed at

North Carolina Court of Appeal ??

82.     On May 2, 2018, PCMH Lawyers filed for (1) Motion to Dismiss plaintiff's Appeal and

21

( 2 ) Motion to compel Discovery. Plaintiff was served on May 14, 2018.

Hearing was set on June 11, 2018.

83.     On May 14, 2018 plaintiff filed for motion to Dismiss the hearing and NC Rule 62

(b)(c)(d) and Rule 12.

84.     On June 11, 2018 the lower Court granted PCMH Motion and dismissed plaintiff

N.C Appeal. On June 20, 2018 Plaintiff received the orders by U.S Mail.

85.     Without defendant presence, the lower court dismissed plaintifft appeal and granted

motion to compel.

86.     Plaintiff never waived his constitutional right and due process to be present

in person or by the phone during the hearing.

The hearing was scheduled at 10:00 AM. The orders was filed at the Court the same day at

10:50 AM. It seemed to plaintiff  the orders were created prior to the hearing as usual by the

the defendant lawyers and Signed by the Court.

87.     Plaintiff requested a transcript from the court, no response from the court yet ?


## CLAIMS


88.     Plaintiff  Pursuant To Due process of law be allowed   and   is requesting for Relief of all

orders in Violation of the law , that Due process of law be allowed and further issues relief as the court

deem appropriate.  Plaintiff's  Civil and Constitution right was denied .

Not only violated due process of  laws , But also denied equal protection under the law.  Federal ,State

North Carolina Medical Act was   ignored . It seem that the law was creatively  interpreted .

89.     Plaintiff brings his claims pursuant to Title 42 U.S Code & 1983 for violations of  Certain

Protections   guaranteed  to plaintiff by the First ,Fifth , Ninth and Fourteenth Amendments of

the federal Constitution

22

90.     Honorable Judge W. Earl Britt under color of law in his capacity as a judge in the the United

States District Court For the Eastern District of North Carolina Western Division Denied

Defendant's motion for relief from judgement pursuant to Rule 60, Motion to Re-open the case

and to Set aside the Judgement, Constitutional Right and Public Trust Action ( 28 U, S ,C &

1331 ) , Rooker- Feldman, Doctrine , Discrimination ,Retaliation and Harassment .

without reading the records or argued the facts . No mention of any statues or cases of law.

91.     Defendant lost valuable property and deprived from due process ( This a Violation the Fifth

Amendment as well as the Fourteen Amendment )

92.     Oversight of Plaintiff - Appellants case by U.S Supreme Court and Fourth Circuit was

abused by District Federal Court to dismissed plaintiff Rule 60 ( b ) motion.

## FRAUD UPON THE COURT

93.     Fraud Upon the Court is where the Judge ( who is Not the Court ) does Not support or uphold

the Judicial Machinery of the Court. The Court is an unbiased , but methodical " creature " which is

governed by the Rule of law ....that is, The Rules of Civil Procedure , Rules of Criminal Procedure and

Rules of Evidence, all which is overseen by Constitutional Law. The Court can ONLY be effective ,fair and

"just " If it is allowed to function as laws proscribe .

94.     Some Judges who are violating their oath of office and are NOT properly following These rules (

Some  Judges are usually grossly ignorant of the Rules and are playing a revised legal game with their \

own created rules. Fraud Upon the Court makes void the orders and Judgement of that Court

95.     **A judge is an officer of the court, as well as are all attorneys. A state judge is a state judicial
officer, paid by the State to act impartially and lawfully. A federal judge is a federal judicial officer,
paid by the federal government to act impartially and lawfully. State and federal attorneys fall into
the same general category and must meet the same requirements. *A judge is not the court.* People v.
Zajic, 88 Ill.App.3d 477, 410 N.E.2d 626 (1980).**

96.     **Whenever any officer of the court commits fraud during a proceeding in the court, he/she is
engaged in "fraud upon the court". In Bulloch v. United States, 763 F.2d 1115, 1121 (10th Cir. 1985),
the court stated "Fraud upon the court is fraud which is directed to the judicial machinery itself and is
not fraud between the parties or fraudulent documents, false statements or perjury. ... It is where the**

23

court or a member is corrupted or influenced or influence is attempted or where the judge has not performed his judicial function --- thus where the impartial functions of the court have been directly corrupted."

97.     "Fraud upon the court" has been defined by the 7th Circuit Court of Appeals to "embrace that species of fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." Kenner v. C.I.R., 387 F.3d 689 (1968); 7 Moore's Federal Practice, 2d ed., p. 512, ¶¶ 60.23. The 7th Circuit further stated "a decision produced by fraud upon the court is not in essence a decision at all, and never becomes final."

98.     "Fraud upon the court" makes void the orders and judgments of that court.

It is also clear and well-settled Illinois law that any attempt to commit "fraud upon the court" vitiates the entire proceeding. The People of the State of Illinois v. Fred E. Sterling, 357 Ill. 354; 192 N.E. 229 (1934) ("The maxim that fraud vitiates every transaction into which it enters applies to judgments as well as to contracts and other transactions."); Allen F. Moore v. Stanley F. Sievers, 336 Ill. 316; 168 N.E. 259 (1929) ("The maxim that fraud vitiates every transaction into which it enters ..."); In re Village of Willowbrook, 37 Ill.App.2d 393 (1962) ("It is axiomatic that fraud vitiates everything."); Dunham v. Dunham, 57 Ill.App. 475 (1894), affirmed 162 Ill. 589 (1896); Skelly Oil Co. v. Universal Oil Products Co., 338 Ill.App. 79, 86 N.E.2d 875, 883-4 (1949); Thomas Stasel v. The American Home Security Corporation, 362 Ill. 350; 199 N.E. 798 (1935).


99.     Under Illinois and Federal law, when any officer of the court has committed "fraud upon the court", the orders and judgment of that court are void, of no legal force or effect.

100.     Federal law requires the automatic disqualification of a Federal judge under certain circumstances.

101.     In 1994, the U.S. Supreme Court held that "Disqualification is required if an objective observer would entertain reasonable questions about the judge's impartiality. If a judge's attitude or state of mind leads a detached observer to conclude that a fair and impartial hearing is unlikely, the judge must be disqualified." [Emphasis added]. Liteky v. U.S., 114 S.Ct. 1147, 1162 (1994).

102.     Courts have repeatedly held that positive proof of the partiality of a judge is not a requirement, only the appearance of partiality. Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 108 S.Ct. 2194 (1988) (what matters is not the reality of bias or prejudice but its appearance); United States v. Balistrieri, 779 F.2d 1191 (7th Cir. 1985) (Section 455(a) "is directed against the appearance of partiality, whether or not the judge is actually biased.") ("Section 455(a) of the Judicial Code, 28 U.S.C. §455(a), is not intended to protect litigants from actual bias in their judge but rather to promote public confidence in the impartiality of the judicial process.").

103.     That Court also stated that Section 455(a) "requires a judge to recuse himself in any proceeding in which her impartiality might reasonably be questioned." Taylor v. O'Grady, 888 F.2d 1189 (7th Cir. 1989). In Pfizer Inc. v. Lord, 456 F.2d 532 (8th Cir. 1972), the Court stated that "It is important that the litigant not only actually receive justice, but that he believes that he has received justice."

24

104.     The Supreme Court has ruled and has reaffirmed the principle that "justice must satisfy the appearance of justice", Levine v. United States, 362 U.S. 610, 80 S.Ct. 1038 (1960), citing Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 13 (1954). A judge receiving a bribe from an interested party over which he is presiding, does not give the appearance of justice.

105.     "Recusal under Section 455 is self-executing; a party need not file affidavits in support of recusal and the judge is obligated to recuse herself sua sponte under the stated circumstances." Taylor v. O'Grady, 888 F.2d 1189 (7th Cir. 1989).

106.     Further, the judge has a legal duty to disqualify himself even if there is no motion asking for his disqualification. The Seventh Circuit Court of Appeals further stated that "We think that this language [455(a)] imposes a duty on the judge to act sua sponte, even if no motion or affidavit is filed." Balistrieri, at 1202.

107.     Judges do not have discretion not to disqualify themselves. By law, they are bound to follow the law. Should a judge not disqualify himself as required by law, then the judge has given another example of his "appearance of partiality" which, possibly, further disqualifies the judge. Should another judge not accept the disqualification of the judge, then the second judge has evidenced an "appearance of partiality" and has possibly disqualified himself/herself. None of the orders issued by any judge who has been disqualified by law would appear to be valid. It would appear that they are void as a matter of law, and are of no legal force or effect.

108.     Should a judge not disqualify himself, then the judge is violation of the Due Process Clause of the U.S. Constitution. United States v. Sciuto, 521 F.2d 842, 845 (7th Cir. 1996) ("The right to a tribunal free from bias or prejudice is based, not on section 144, but on the Due Process Clause.").

109.     Should a judge issue any order after he has been disqualified by law, and if the party has been denied of any of his / her property, then the judge may have been engaged in the Federal Crime of "interference with interstate commerce". The judge has acted in the judge's personal capacity and not in the judge's judicial capacity. It has been said that this judge, acting in this manner, has no more lawful authority than someone's next-door neighbor (provided that he is not a judge). However some judges may not follow the law.

110.     If you were a non-represented litigant, and should the court not follow the law as to non-represented litigants, then the judge has expressed an "appearance of partiality" and, under the law, it would seem that he/she has disqualified him/herself.

111.     However, since not all judges keep up to date in the law, and since not all judges follow the law, it is possible that a judge may not know the ruling of the U.S. Supreme Court and the other courts on this subject. Notice that it states "disqualification is required" and that a judge "must be disqualified" under certain circumstances.

112.     The Supreme Court has also held that if a judge wars against the Constitution, or if he acts without jurisdiction, he has engaged in treason to the Constitution. If a judge acts after he has been automatically disqualified by law, then he is acting without jurisdiction, and that suggest that he is then engaging in criminal acts of treason, and may be engaged in extortion and the interference with interstate commerce.

112.     Courts have repeatedly ruled that judges have no immunity for their criminal acts. Since both treason and the interference with interstate commerce are criminal acts, no judge has immunity to engage in such acts.

25

North Carolina State Court

113.     Honorable Judge Richard Doughton deprived plaintiff from his constitutional rights to defend his valuable property (hospital privilege claimed that the plaintff case was malicious and frivolous). The Honorable Judge Richard Doughton ruling was affirmed by North Carolina court of appeal and North Carolina Supreme Court.

114.     North Carolina Court System Court system deprived plaintiff from his constitutional  right for fair trial.  Defendant filed on multiple occasions a motion for reconsideration a recusal of Honorable Judge Richard Doughton .  Plaintiff request was denied. )

115.     Plaintiff explained in detailed that Honorable Judge Richard Doughton's impartiality

( biased ) was questionable to handle plaintiff's case.

116.     Honorable Judge Richard Doughton ignore the requirement of Health Care Quality

improvement Act.These include the Federal law statue and immunity , North Carolina immunity and

Privilege , and North Carolina Medical Act. *(Brown vs. Presbyterian Health Care Svcs.)*


117.     The North Carolina lower Court Orders was written by Pitt County Hospital Lawyers and

signed by Honorable Judge Doughton without any verification if lawful or unlawful or matched

with the hearing or not.

118.     Honorable Judge Richard Doughton Granted Motion of Summary Judgement to defendantf by

giving absolute immunity to PCMH and their physicians . The trial Court Judge was not aware

that HCQIA immunity is acquired and Rule 56 (d) (g) was not followed

119.     The Trial court judge said that plaintiff case is a complicated one and it is very hard to be

tried at North Carolina Court due to North Carolina 's immunity and privilege . Forward

plaintiff 's case to North Carolina Court of Appeal for second opinion This was against

Rule 56. The Trial Court never made any ruling against plaintiff  Injunction Relief or Punitive Damage

Claims.

26

120.    HCQIA does not provide immunity from injunctive or declaratory relief, citing Sugarbaker v. SSM HealthCare, 190 F. 3d 905, 918 (8th Cir. 1999), cert. denied, 528 U.S. 1137 (2000). *(Johnson v. Greater Southeast Community Hospital Corp.)*

121.    NC "§ 6-21.5. Attorney's fees in non-justifiable cases Rule 50, or a motion for summary judgment pursuant to G.S. 1A-1, Rule 56, is not in itself a sufficient reason for the court to award attorney's fees, but may be evidence to support the court's decision to make such an award. A party who advances a claim or defense supported by a good faith argument for an extension, modification, or reversal of law may not be required under this section to pay attorney's fees.

121.    The court shall make findings of fact and conclusions of law to support its award of attorney's fees under this section. (1983 (Reg. Sess., 1984), c. 1039, s. 1; 2006-259, s. 13(l).)"

122.    As far as plaintiff is aware of, summary judgment motion is not enough to award legal fees for punitive damage claims (no cases of law).The only claim awarding legal fees after summary judgment motion is deceptive trade claim which is not applicable for legal and medical fees.

123.    Both plaintiff 's claims ( Injunction Relief and Punitive Damage ) was Dismissed By North

Carolina Court of Appeal for not Appealing the protective order and wrong enforcement of

statue of limitation ( The North Carolina Court of Appeal was asking Defendant to filed his

claims right away after the corrective action prior the administrative procedure - not following

( Exhaustion of Remedies Doctrine )

124.    PCMH lawyers creatively interpreted N.C Gen Stat & ID - 45 . Without citing any case

Law support or factual or reasonable basis and only echoing the words of N.C Gen. Stat & ID 45

Defendant lawyers asked the lower court Judge to award all their attorney's fees of

$444,554.45 which was granted by lower court judge without verification of their billing

records.

125.    No evidence was provided to the court that plaintiff should know and had to know his

claim was malicious and frivolous.

On May and June of 2014

Defendant lawyer ( Creech and Salsman wrote in their briefing for motion of Taxation and legal fees. Even in the order which was written by Salsman and signed by Judge Doughton without any verification. The NC Medical Board Consent order was a reason for initiation of corrective action and the reason for the revocations plaintiff hospital privileges

27

This was a fraudulent allegation. The NC Medical Board Consent order was not a reason for initiation of corrective action nor the reason for revocation plaintiff hospital privilege.

126.     Plaintiff filed for North Carolina Rule 59 and Rule 60 which include new evidence (all the Privileged materials). David Creech wrote a letter to Guam Memorial Hospital and forward to them privileged materials including the request for corrective action dated Aug 26,2004 from Dr Whatley ,Dr. Barrier's Sept letters , Dr. Brown's Adhoc Committee and Dr. Olsen's fair hearing Committee documents .

127.     According to Bryson Vs Haywood Regional Medical Center, Defendant could be able to use these documents because David Creech gave this documents to Guam Memorial Hospital This documents lost its North Carolina privilege and became discoverable.

128.     The Trial Court Judge was deceiving the North Carolina Court of Appeal by order motion of Stayed pending appeal and denied the hearing of NC Rule 59 and NC Rule 60.

And The Trial Court Judge was holding the new evidences ( all the privileged materials ) and forward Defendant case to North Carolina Court of Appeal with deficit record.

The Trial Court Judge was not aware that North Carolina Court of Appeal knew about NC Rule 59 and NC Rule 60.

129.     Plaintiff had three back to back Peer Reviews, none of them were related to NC Medical Board Consent order and was not approved by the executive committee according to the by-laws.

First Peer Review

In early 2004, PCMH began to raise the issue of whether plaintiff was physically examining his patients.

Second Peer Review

In June 2004, Paul Bolin initiated Peer Review As a part of plaintiff re-appointment for 2004

Plaintiff mentioned in his application the malpractice lawsuits regarding Mr. Ward.

Third Peer Review

In July 2004, Whatley initiated Peer Review that plaintiff was not following PCMH ID

28

Protocol NC Medical Board Consent order was terminated prior to the first corrective action.

130.     Defendant lawyers ( Creech and Salsman ) wrote in the same briefing and the same order The misrepresentation of plaintiff primary site of delivery and the true nature of his practice never would have received admitting privileges at PCMH. These were fraudulent allegations.

131.     PCMH was the only tertiary hospital approved by Medicare for in-patient Dialysis, plaintiff is Board Certified Nephrologist .PCMH was the primary site of delivery for defendant's patients care.

132.     After summary suspension of plaintiff PCMH privilege.  Plaintiff lost all of his Dialysis patients and also out patients Dialysis Clinic privilege.

133.     Defendant lawyer (Creech and Salsman) reasoned that the punitive claims was the main nucleus for plaintiff case which was the court awarded the entire legal fee ,paralegal and also the appellate court without reading the billing record.

This was also fraudulent allegation.

134.     Debbie Meyer and Karen Zaner on Jan 2010 filed for plaintiff response and memorandum of law in opposition to defendant's motion to dismiss [ Rules 12 A ( b )(1) and (12)(b)(6) ] Debbie and Karen asked for punitive damage for defamation, fraud and Tortious interference. (Exhibit H)

135.     On March 20,2011 David Creech did not request for summary judgment motion against plaintiff punitive damage . On March 30,2011 Karen never defendant punitive damage claim.

136.     NC 1D 15d No punitive damage for Breach of contract.

Claims should Be Granted To  plaintiff To Determine Either Federal , State

Statue Or North Carolina Medical Acts was followed. It seem that the law are creatively

interpreted .

137.     The long- standing rule in North Carolina is that , unless a statue provides otherwise ,

parties to litigation are responsible for their own attorney fees. Hicks v. Albertsons ,284

N.C. 236, 238 ( 1973 ) ; Stevenson v. Bartlett, 177 N.C. App. 239, 244-45 (2006)

( quoting City of Charlotte v. McNeely , 281 N.C. 684 691 ( 1972 ) ( Attorney fees in this

State are entirely creatures of legislation and without this do not exist. )

138.     G.S. 6-21.5 permits a court to award fees to prevailing party where the claimant pursued

a claim the law does not recognize or for which the court cannot provide redress

The legislative purpose behind the statue is to discourage frivolous legal action  persist.

29

Nova Constr., Inc v. Edwards 195 N.C.App 55, 66 ( 2009) ( quoting Short v. Bryant,

97 N.C.App.327,329 (1990).

139. The trial court must conduct a review of all relevant pleading and documents in determining weather fees are appropriate. Lincoln v. Bueche ,166 N.C. App150, 153 ( 2004); Badri's v. Town of Long Beach, 208 N.C.App718. 722( 2010);

140. The trial court shall make finding the fact and conclusion of law to support its award of

attorney 's fees under this section." G.S. 6-21.5 Brooks v. Giesey, 334 N.C. 303,

311 - 313 (1993)

141. The lower court Judge neither read plaintiff case , striking all defendant affidavits even his own nor reading Defendant billing records. Even the lower court judge supposed to see the privilege material under camera which was never done.

142 The lower court Judge signed the order which was written by defendant lawyers, agreed

about fraudulent allegations about defendant lost hospital privilege in relation to North Carolina

Consent order, plaintiff punitive claims was the nucleus in defendant case and defendant primary

site of practice was outside Pitt County.

143. The lower Court Judge was not aware why plaintiff lost his hospital privilege and how many corrective actions were done against plaintiff.

144. Even the lower court Judge award absolute immunity to PCMH , And lower court Judge was not aware of the requirements of immunity according to Federal Statue. (HCQIA)

*(Brown v. Presbyterian Health  Care Svcs.), (Islami v. Covenant Medical Center),  (Granger v. CHRISTUS Health Central  Lousiana)*

144. The corrective action was done by the Board of Trustees, The Board of Trustees have no immunity, They are liable for punitive claims.

145. Pursuant to Rule 12 (b)(6) (was not followed)

[d]dismissal is proper when one of the following three conditions is satisfied : (1)the complaint on its

face reveals that no law supports the plaintiff claim; (2) the complaint on its face reveal the absence of

facts sufficient to make a good claim, or (3) the complaint disclaimer some fact that defeats the

plaintiff 's claim.

30

146. NC 19.1 Statute of Limitation

The court found that there are no special circumstances that would make the award of

Attorney's fees unjust .The party shall petition for attorney's fee within 30 days

Following final disposition of the case, (plaintiff case dismissed at NC Supreme court

On Dec 12/2012 – PCMH Lawyer filed a motion of taxation on Jan 23 /2013 )

147. NC 21.2 Attorneys fee in notes, etc.

If such note, conditional sale contract or other evidence of indebtedness provides for the payment of

reasonable attorneys' fees by the debtor, without specifying any specific percentage, such provision

shall be construed to mean fifteen percent (15%) of the "outstanding balance" owing on said note,

contract or other evidence of indebtedness.

148. NC 21.6 Limitation on Amount

The act limits the amount of attorneys that may be recovered. They cannot exceed the amount of

monetary damages award in the matter of the action is brought by a party primarily for the recovery

of monetary damages.

149. NC 1D- 25. Limitation of amount of recovery

Punitive damages were awarded against defendant and shall not exceed three times the amount of

compensatory damages or two hundred fifty thousand dollars ($250.000)

150. The North Carolina Court of Appeal gave the right for the Trial Court To determine that

Plaintiff 's claim for punitive damages against Plaintiff was frivolous and malicious

( Page 3 ) .The Trial Court Judge was deceiving the North Carolina Court of Appeal for number

of findings ( Page 4 ) .

The North Carolina Court of Appeal was not aware all of this finding was fraudulent and was

written by defendant lawyers .The only thing The Trial Court Judge did was signing the order without

any verification.

151. The defendant lawyer succeeded to put all of the defendant's facts as privileged and when

31

Plaintiff lawyer questioned this matter, they answered them back, " Because I said so"

152.    Plaintiff  after he lost his legal representation, defendant get used to filed his motion by

first class U.S Mail certified and addressed to Lori A. Strayer ( Trial Court Coordinator)

On August 2016 plaintiff filed for noticed of appeal and requested all the records of

Summary Judgment go to North Carolina Court of Appeal ( No pending appeal docketed at North

Carolina Court of Appeal ?? )

153.    On May 2, 2018, PCMH Lawyers filed for (1) Motion to Dismiss plaintiff's Appeal and

( 2 ) Motion to compel Discovery. Plaintiff was served on May 14, 2018.  Hearing was set on June 11,
2018.

154.    On May 14, 2018 Plaintiff filed for motion to Dismiss the hearing and NC Rule 62

(b)(c)(d) and Rule 12.

155.    On June 11, 2018 the lower Court granted PCMH Motion and dismissed Plaintiff   N.C Appeal.
On June 20, 2018  Plaintiff received the orders by U.S Mail.

156.    Without Plaintiff  presence, the lower court dismissed plaintiff appeal and granted motion to
compel.

157.    Plaintiff never waived his constitutional right and due process to be present in person or by
the phone during the hearing.

The hearing was scheduled at 10:00 AM. The orders was filed at the Court the same day at

10:50 AM. It seemed to plaintiff the orders were created prior to the hearing as usual by the

the defendant lawyers and Signed by the Court.

158.    Plaintiff requested a transcript from the court, no response from the court yet ?

Federal Court

159.    Plaintiff  Sherif A Philips, MD is not a lawyer, has expended substantial

personal resources fighting legal battles to protect plaintiff constitutional property rights.

Plaintiff spent almost $ 2 M for legal fees.

160.    Unexpected and unethical withdrawal of all plaintiff lawyers which was approved by NC

lower court judge. plaintiff found himself without legal presentation and plaintiff is unable to

afford one.

161.     Plaintiff Sherif A Philips filed a Motion for Rule 60 within the statute of limitations and plaintiff was addressing the court from Guam .

109.     Honorable Judge W. Earl Britt denied defendant motion  and the court's decision was sent to North Carolina Address!  Plaintiff contacted the Clerk's Office and Plaintiff was advised to change plaintiff address of service to Guam by official Letter.

162.     Plaintiff Sherif A. Philips, MD, On July 10, 2017 wrote an official letter to honorable Chief United State States District James C. Dever III to inform the court that plaintiff address for service is at Guam.

163.      The District Court sent the Court Decision regarding denying plaintiff motion to reopen plaintiff case again to North Carolina address by mail around Aug 28, 2017.

164.     Plaintiff got the ruling around the first week of Sept. at Guam.

165.      Plaintiff was denied electronic filing and electronic notification by the court before.

166.     Plaintiff wrote his notice of appeal on Sept 12, 2017 and the following day was sent by certified express mail

167.     Plaintiff never been served by the clerk office within 21 days to plaintiff's corrected address and the district court insisted to still serve plaintiff on the wrong address. As result of that plaintiff's  appeal at the Fourth Circuit was denied.

168.     Motion Should Be Granted To plaintiff Pursuant To Rule 41 ( b )

169.     Res Judicata and Collateral estoppel , along other argument is not applicable. Honorable Judge Fox dismissed defendant case with prejudice without collateral review of the case. Rule 41(b). The dismissal had been ordered in non-Jury case after a trial in which both parties had had a full opportunity to present their claims and defenses and in which finding the fact and conclusion of law had been entered.

170.     Plaintiff asked Honorable Judge Fox to get the record form NC state Court and to have legal counsel Plaintiff  request had been denied.

171.    Plaintiff case had been dismissed for 1- Violation of Rule 8(a) and Rule 10 , Plaintiff corrected and followed both Rule 8 (a) and Rule 10 in defendant reply brief. Even defendant re-wrote his claim for discrimination, whistleblower, and stark law.

Plaintiff Pursuant To Wrong Enforcement of Statue of limitation.

172.    According to Supreme Court's 2007 decision in Ledbetter v. Goodyear Tire and Rubber Co .had a dramatic impact on the timeliness of discrimination claims. Also according Obama  Administration no statute of limitation for discrimination claims.

173.    Discrimination claim on Philips 1 vs. PCMH , Whatley and Bolin was dismissed by Hon J Fox for none compliance with discovery process ( Discrimination never been argued )

174.    Plaintiff filed "Philips 4" on Feb 15 / 2015 vs multiple parties and new Federal claims. All of the Plaintiff 's claims never been litigated and was improperly dismissed in unlawful ways. Even the new defendants (David Creech and Jay C. Salsman) had been dismissed without any argument.

175.    Malpractice claims were a new claims , dismissed in relation to Statue of limitation . Judge Fox did a mistake , Judge Fox granted the statute of limitation on the date of filling the law suits. Claims for professional malpractice in NC must filed within three years from the date they occurred but no more than four years from the last act giving rise to the claim (N.C G.S & 1-15(c)).

176.    All of the plaintiff lawyers filed for motion to withdraw which was granted by the lower court Judge on October 2013. Ms Meyer and Ms Zaner filed for punitive damage claims in Every Federal and State claims. If Ms Meyer and Ms Zaner felt that plaintiff claims were malicious or frivolous why both lawyers filed for such claims.

177.    Due to unexpected withdrawals of all Plaintiff lawyers, Plaintiff had hard time to defend

his punitive damage claim and to approve to the court that plaintiff claim was not

frivolous and malicious. Motion of legal fees and Taxation was granted by lower court on July 2014.

Plaintiff brought his claim on March 2015.

No Statue of limitation for Medicare Fraud and taking over North Carolina properties

( Whistleblower Claims )

178- Plaintiff filed for Rule 60 ( b ) , The Defendant Case went back to Honorable Judge Fox

He kept almost over one year , And Honorable Judge Fox disqualified himself ?

179.    Oversight of Plaintiff - Appellants case by U.S Supreme Court and Fourth Circuit was

abused by District Federal Court to dismissed plaintiff Rule 60 ( b ) motion.

180- The District Federal Court dismissed both Rule 60 (b) and Re-open Motions without any

34

hearings, reading the records , arguments and even without mention any statues or cases of

law.

181.Defengant has constitutional right to challenged the fairness of plaintiff's trial at

North Carolina Courts

( Pure Void-For-Vagueness in Skilling V. United States )

182.    Honorable Judge Fox dismissed planitff's case  (twice) without any hearing. Honorable

Judge Fox  deprived  plaintiff from summary judgment motion to prove the merit of plaintiff 's claim.

183.    After a decade of legal battles defendant did know why plaintiff privilege was terminated.
Every briefing or Court orders the causes were completely different.

184.    From the official letters provided to the plaintiff by PCMH or from the report to Data Bank
defendant privilege ,was summary suspended and terminated for none - professional review issues.

185.    Plaintiff  privilege was terminated as mentioned in every PCMH official letter that plaintiff was
not following hospital by-law .

186.    Every court judge tried to dig in for professional review issues to support the plaintiff's case of
peer review and Every court did not follow the requirement of NC medical act and state law.

187.    Both Federal and state lower court mishandled plaintiff ' claims, pursued that the law did not
recognized plaintiff 's claims or which the court cannot provide redress. plaintiff's claims never been
dismissed pursued To Rule 12 . Plaintiff's claims was dismissed pursued to wrong absolute immunity
to PCMH and their physicians, not appealing the protective orders ( which was fraudulent creation by
PCMH lawyers ) , wrong enforcement of the statute of limitation , the laws are creatively  interpreted
Due process allowed by the law never been followed and legal misrepresentation by  plaintiff legal
team.

188.    No hearing Should Be Granted To defendant Pursuant To Rooker-Feldman Doctrine

189.    Court apply the Rooker-Feldman doctrine when the following four factor are present

    1.  The plaintiff seeking to bring a claim in federal district has already lost on that claim in the
        state court.

    2.  The plaintiff is complaining that the state court judgment caused him some sort of injury
        or harm.

    3.  The plaintiff is asking the federal district court to review and overturn the state judgment.

    4.  The State court finalized its decision on the claim before the federal district court began its
        own proceedings.

35

(Exxon Mobil Corp.v. Saudi Basic Industries Corp, 544 U.S 280 (2005)

## THE LAW OF SUMMARY SUSPENSION HAD BEEN CHANGED

**190.    The Standard and Documentation Requirements.**

A summary suspension of a medical staff member's practice can only be imposed

where continuation of practice---constitutes an immediate danger to the public , including

patients, visitors and hospital employees and staff

191.    A summary suspension. May not be implemented unless there is actual documentation or

other reliable information that an immediate danger exists.

192.    The documentation or information must be available at the time the summary suspension

is made. The intent behind this amend ant was to narrow the scope on which a suspension

decision is made and to make sure that the information is based on hard evidence rather than

rumor or innuendo. For example an internal and/or external review in the form of minutes or a

report which establishes that an immediate danger exist

193.    Summary suspension must be based on the immediate danger standard.

194.    External Reviews is becoming more prevalent for medical staff and hospital to consider

using third party reviewers to evaluate patient medical records where questionable care has been

provided. The reasons for doing so include conflicts of interest, evaluation of a medical specialist

for which there may not be a comparable peer ,or to promote the goal of being fair and objective

when evaluating quality of care issues. (Neither record nor external reviewer was available for

plaintiff corrective action)

195.    Most would agree that the imposition of a summary suspension has the most significant

adverse impact on a physician's career and reputation compared to any other form of disciplinary

action.

196.    Hospitals and medical staffs typically will shy away from a physician applicant with

summary suspension on his or her record because these decisions are typically reserved for most

egregious situations in which the life or well-being of patients and other individuals in the

hospital are placed in serious jeopardy by the physician's action or conduct.

197.    Summary suspension where this is a violation of hospital policy or where the

physician's conduct may be disruptive of the medical staff or hospital operations. These
and other alternative grounds for summary suspension are no longer allowed.


Retaliation and Harassment by Pitt County Hospital and PCMH Lawyers

198. PCMH do not have mal-practice insurance , PCMH acquired Harris and Creech law firm
( as malpractice lawsuit firm ) prior defendant filling any claims , Harris and Creech firm was
Taking over the peer review and convinced the leadership hospital committee to change the
agenda of the peer review and to enforce summary suspension regardless of the opinion of the
Executive committee.

199. After Plaintiff filed Philips 1 , Creech met with the leadership hospital committee to
Retaliate from plaintiff and to get rid of plaintiff.

200.Creech was threatening plaintiff to drop either the law suits or the physicians from the law
Suits or else Creech was going to ruin plaintiff career and reputation and Creech was seeking the
legal fees

201. Creech contacted Guam newspaper to ruin plaintiff career and reputation

202. Creech was recruiting expert witness to change the agenda for North Carolina Medical
Board.

203. Creech was obstructing PCMH to answer any inquiry regarding plaintiff to have a new
license in different states and to acquired other opportunity .

204. Creech was requesting for autopsy for every patients that died under care of plaintiff
Between Philips 1 and Philips 2. Creech was fishing for any mistake.

205.Creech released privilege material regarding plaintiff dialysis unit peer review to North
Carolina Medical Board.

206. Creech was reporting to North Carolina Medical Board up to 2007 , Even After the
corrective action was finalized on 2006 which forced plaintiff to put his North Carolina license
to be inactive.

207.Plaintiff 's nurse ( was a witness at the fair hearing on defendant behaves ) . PCMH
retaliated from her and fraudulent report her to the nursing Board .

208. PCMH retaliated from Plaintiff's wife by forcing her to give away PCMH privilege and

threatening defendant's wife that PCMH would report her to North Carolina Medical Board.

209. PCMH lawyers got in touch with Vivian ( defendant 's Witness ) and threatening her to change her testimony .

209. PCMH was blocking plaintiff to have good legal presentation . PCMH had contracts with all well respected law firms in the surrounding counties . They were blocking the appearance of Karin Zaner appearance.

210. PCMH lawyers kept harassing plaintiff by serving him at North Carolina Address , not at Guam

211. All the orders was created and was written by PCMH lawyers , The law never been followed but creatively interpreted .

**Prayers**

Plaintiff prayed to Court accept his Claims

Sherif A. Philips, MD

1406 North Marine Corps Drive
Upper Tumon, GU 96913
Telephone: (671) 689-7611
Email: sherifap@aol.com

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that he served a copy of the following **Fraud Upon the Court ,Grant Relief Under 28U.S.C § 1655 and Set Aside Judgement for**
**Fraud on the Court , Due process of law be allowed Relief of orders in violation of the laws, Under Title 42 United State Standard 1983 ,Constitution Right and Public Trust Action ( 28 U.S.C& 1331) , The Right- to - Honest- Service Doctrine and Vagueness Doctrine ,Rooker-Feldman ,Doctrine , Discrimination , Retaliation and Harassment Asking for new Trial the law of Summary Suspension had been Changed**
*on the opposing parties, this 26th day of December 2018 addressed as follows:*

/s/ w. Gregory Merritt
State Bar Number: 23333
E-mail: wgm@harriscreech.com
Harris, Creech, Ward & Blackerby, P.A.
325 Pollock Street
P.O. Drawer 1168
New Bern, NC 28563-1168
Telephone: (252) 638-6666
Facsimile: (252) 638-3542
Attorneys for Vidant Medical Center
 (Pitty County Memorial Hospital),
   Paul Bolin, M.D. Ralph Whatley, M.D.
   David Creech, and Jay Salsman

40



FILED
SUPERIOR COURT
OF GUAM

2018 SEP 21 AM 10: 48

CLERK OF COURT

By:_____

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| PITT COUNTY MEMORIAL HOSPITAL, INCORPORATED,<br><br>Plaintiff,<br><br>vs.<br><br>SHERIF ANTOUN PHILIPS, M.D.,<br><br>Defendant. | Superior Court Case No. <u>CV0478-18</u><br><br>**ORDER DENYING MOTIONS AND SETTING HEARING DATES** |

On September 7, 2018, the Court issued a Decision and Order re Motion to Dismiss. That decision denied Defendant Sherif Philips, M.D.'s motion to dismiss the Complaint for Enforcement of Judgment and concluded that Plaintiff Pitt County Memorial Hospital, Inc. adequately stated a cause of action and that the Court had subject matter jurisdiction over Pitt County's claims.

Philips now submits two new filings: (1) "Rule 59 and Rule 62;" and (2) "Rule 60(b) Grant Relief Under 28 U.S.C. § 1655 and Set Aside Judgment for Fraud on the Court Honest Service Doctrine and Vagueness Doctrine Request for Hearing for Defendant Counter Claim." Though not explicitly designated as motions, the Court construes both documents to be motions for certain relief.

As noted in the Court's Decision and Order re Motion to Dismiss, Guam's Rules of Civil Procedure govern the procedural aspects of this case. Thus, the Court first examines whether Dr. Philips may utilize Guam's Rules of Civil Procedure 59 and 62 at this juncture. Guam's Rule 59

applies when a party seeks a new trial or an amended judgment. Rule 62 governs the stay of a proceeding to enforce a judgment. Both rules, therefore, set out procedural methods by which a judgment may be attacked or affected after a judgment has been issued by a Guam court, or a trial has occurred.

On the other hand, this case is pre-trial and pre-judgment. The Court has yet to issue a Scheduling Order and has not issued a judgment on any dispositive issue. Rules 59 and 62 are therefore not applicable at present, and the Court DENIES the first filing, "Rule 59 and Rule 62."

As for the second filing which references "Rule 60(b)," Guam's Rule of Civil Procedure 60(b) governs relief from judgments or orders for circumstances such as mistake or newly discovered evidence, among other reasons. In reviewing Dr. Philips' motion, however, this Court does not find any arguments made by Philips which asks that the Court reconsider or excuse its September 7, 2018 Decision and Order re Motion to Dismiss. The "Rule 60(b)" document instead appears to ask that the North Carolina state judgment at issue be reconsidered. This court, however, has not made any determination about whether this Court may or may not enforce the North Carolina state judgment. If Dr. Philips wants the Court to review this issue by way of a motion, he must file the appropriate motion, which may or may not include a motion for summary judgment. If it is a motion for summary judgment, it must comply with the requirements of Guam Rule of Civil Procedure 56, as well as Local Rule CVR 7.1, including CVR7.1(g) governing the length of motions. As it is unclear what relief Dr. Philips seeks,[1] but it is clear that his filing does not ask this Court to reconsider its September 7, 2018 Decision and Order, the Court must DENY the Rule 60(b) filing.

The denials of both motions are without prejudice.

---

[1] Dr. Philips also seeks relief under 28 USC § 1655, which falls under federal laws governing civil procedure in the federal courts. It is unclear to this Court how section 1655 applies here.

Pitt County has also moved for summary judgment. Dr. Philips is reminded to file any opposition by October 15, 2018. Pitt County may file a reply by October 29, 2018. The motion for summary judgment will be heard on November 7, 2018, at 10:00 a.m.

Finally, the parties are reminded of the October 17, 2018 Scheduling Conference which will be held at 9:00 a.m. It appears the parties have not yet come to an agreement on the trial, discovery, and motion dates. The Court encourages the parties to satisfy their obligations under Guam Rule of Civil Procedure 26(f) and CVR 16.2 to meet and confer to reach agreement on all trial and pretrial dates and to discuss settlement, if appropriate.

SO ORDERED this 21st day of September 2018.

**HON. ELYZE M. IRIARTE**
**Judge, Superior Court of Guam**

I do hereby certify the foregoing is a full true and correct copy of the original on file in the office of the clerk of the Superior Court of Guam

OCT 2 4 2018

Joseph L. Torres, Jr.
Deputy Clerk Superior Court of Guam

SERVICE VIA COURT BOX
I acknowledge that a copy of the original hereto was placed in the court box of

Date: 9/21/18   Time: 12pm

Deputy Clerk, Superior Court of Guam

ORIGINAL

Berman O'Connor & Mann
Received

DEC 17 2018

Time: 3:30 By: PS

FILED
SUPERIOR COURT
OF GUAM

2018 DEC 14 AM 11: 55

CLERK OF COURT

BY _____

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| PITT COUNTY MEMORIAL HOSPITAL, INC.<br><br>Plaintiff,<br><br>vs.<br><br>SHERIF ANTOUN PHILIPS, M.D.,<br><br>Defendant. | Superior Court Case No. CV0478-18<br><br><br>DECISION AND ORDER<br>RE<br>MOTION FOR CLARIFICATION<br>AND RECONSIDERATION |

On October 10, 2018, Defendant Sherif Philips, M.D., filed a Motion for Clarification and Reconsideration pursuant to section 1008(a) of the California Code of Civil Procedure. Though unclear in his filing, Phillips seems to be asking this Court to review its September 21, 2018 Order ("September 21 Order") which denied Philips' two previous motions: (1) "Rule 59 and Rule 62;" and (2) "Rule 60(b) Grant Relief Under 28 U.S.C. § 1655 and Set Aside Judgment for Fraud on the Court Honest Service Doctrine and Vagueness Doctrine Request for Hearing for Defendant Counter Claim."

CCP § 1008(a) is an application to reconsider and modify or revoke a prior court order, and is procedurally inapplicable. Going beyond the procedural citation and looking at the merits of the motion, Phillips again asks this Court to clarify or reconsider the North Carolina state judgment. As stated in this Court's September 21 Order, this Court has not made any determination about whether it may or may not enforce the North Caroline state judgment, and Phillips has not filed the appropriate motion requesting that the Court do so.

By failing to make any new arguments and again failing to file the appropriate motions according to Guam law, the Plaintiff is presenting the Court with frivolous motions. Under Rule 7.1(k) of the Local Rules of the Superior Court of Guam, "[t]he Court need not consider motions, oppositions to motions or briefs or memoranda that do not comply with this Rule," and "the presentation to the court of frivolous motions or oppositions to motions...subjects the offender at the discretion of the Court to the sanctions of General Rule 2.1." Sanctions include "monetary sanctions and/or the imposition of costs and attorney's fees to opposing counsel, as the Court may deem appropriate under the Circumstances." GR 2.1. The Court forewarns that any further frivolous or repetitive filings by the Defendant may subject him to sanctions.

Accordingly, for the reasons set forth above, Defendant's Motion for Clarification and Reconsideration is **DENIED**.

SO ORDERED this 14th day of December 2018.

**HON. ELYZE M. IRIARTE**
**Judge, Superior Court of Guam**

I do hereby certify that the foregoing is a full true and correct copy of the original on file in the office of the clerk of the Superior Court of Guam. Dated at Hagåtña, Guam.

DEC 1 4 2018

Jermie K.C. James
Deputy Clerk

FILED
SUPERIOR COURT
OF GUAM

2018 SEP 14 PM 12: 47

CLERK OF COURT

By:_____

COPY

Berman O'Connor & Mann
Received

SEP 14 2018

Time:_12:00_ By:____

Sherif Philips, MD
1406 North Marine Corps Drive
Upper Tumon, GU 96913
Telephone: (671) 689-7611

# The Superior Court of Guam

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CIVIL CASE NO. CV0478-18

|  |  |
|---|---|
| *Pitt County Memorial Hospital,INC, Paul Bolin Ralph Whatley, David Creech, Jay Salsman* | ) |
|  | ) |
|  | ) |
| *Plaintiff,,* | ) |
|  | ) |
| *v.* | ) |
|  | ) |
| *DR SHERIF PHILIPS* | ) |
|  | ) |
| *Defendants,* | ) |
|  | ) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## Rule 59 and Rule 62

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1.   Now Come the Defendant Sherif A Philips,MD to file for Rule 59 (1)(6)(7)(8)(9) and Rule 62(b)(3)(4).

2.   PCMH Lawyers creativity interpreted N.C Gen Stat & ID -45 . Without citing any case law support or factual or reasonable basis and only echoing the word of N.C Gen.Stat & ID 45 PCMH Lawyers asked the lower court Judge to award all their attorney's fees of 444,554,45 **(Exhibit A)**

3.   No evidence was provided to the court that defendant should know and had to know his claims was malicious and frivolous.

4.   Both Federal and State Court mishandled Defendant Case pursued that the law did not recognized Defendant claims or which the court cannot provide redress.

5.   Defendant claims never been dismissed pursued to Rule 12

6.   Defendant claims was dismissed pursued to wrong absolute immunity to PCMH and Their Physician, not appealing the protective orders ( which was fraudulent creation by PCMH Lawyers) , wrong enforcement of the statue of limitation, the law are creatively interpreted North Carolina Court System deprived defendant from his constitutional right for fair trial.

7.   Defendant filed on multiple occasions a motion for reconsideration a recusal of Honorable Judge Richard Doughton , Defendant request was denied. ( up to five time ).

8.   Honorable Judge Doughton was biased , He ignore North Carolina State Statues and

Federal Statutes . And not only violated due process of law , but also denied equal protection under the law.

9.      All of the North Carolina Lower Court Orders was written by PCMH Lawyers and signed by Honorable Judge Doughton without any verification if lawful or unlawful or matched with the hearing or not. *(Exhibit D)*

10.     The long- standing rule in North Carolina is that , unless a statue provides otherwise , parties to litigation are responsible for their own attorney fees. Hicks v. Albertsons ,284 N.C. 236, 238 ( 1973 ) ; Stevenson v. Bartlett, 177 N.C. App. 239, 244-45 (2006) ( quoting City of Charlotte v. McNeely , 281 N.C. 684 691 ( 1972 ) ( Attorney fees in this State are entirely creatures of legislation and without this do not exist. )

G.S. 6-21.5 permits a court to award fees to prevailing party where the claimant pursued a claim the law does not recognize or for which the court cannot provide redress The legislative purpose behind the statue is to discourage frivolous legal action  persist. Nova Constr., Inc v. Edwards 195 N.C.App 55, 66 ( 2009) ( quoting Short v. Bryant, 97 N.C.App.327,329 (1990).

11.     The trial court must conduct a review of all relevant pleading and documents in determining weather fees are appropriate. Lincoln v. Bueche ,166 N.C. App150, 153 ( 2004); Badri's v. Town of Long Beach, 208 N.C.App718. 722( 2010);

12.     The trial court shall make finding the fact and conclusion of law to support its award of attorney 's fees under this section." G.S. 6-21.5 Brooks v. Giesey, 334 N.C. 303,

311 - 313 (1993).

13.    The law had been changed to impose Summary Suspension.

14.    The Standard and Documentation Requirements.

15.    A summary suspension of a medical staff member's practice can only be imposed

where continuation of practice---constitutes an immediate danger to the public , including

patients, visitors and hospital employees and staff

16.    A summary suspension. May not be implemented unless there is actual documentation

or other reliable information that an immediate danger exists.

17.    The documentation or information must be available at the time the summary

suspension is made. The intent behind this amend ant was to narrow the scope on which a

suspension decision is made and to make sure that the information is based on hard evidence

rather than rumor or innuendo. For example an internal and/or external review in the form of

minutes or a report which establishes that an immediate danger exist.

18.    Summary suspension must be based on the immediate danger standard.

19.    External Reviews is becoming more prevalent for medical staff and hospital to consider

using third party reviewers to evaluate patient medical records where questionable care has

been provided. The reasons for doing so include conflicts of interest, evaluation of a medical

specialist for which there may not be a comparable peer ,or to promote the goal of being fair

and objective when evaluating quality of care issues. (Neither record nor external reviewer was

available for plaintiff corrective action).

20.    Most would agree that the imposition of a summary suspension has the most significant adverse impact on a physician's career and reputation compared to any other form of disciplinary action.

21.    Hospitals and medical staffs typically will shy away from a physician applicant with summary suspension on his or her record because these decisions are typically reserved for most egregious situations in which the life or well-being of patients and other individuals in the hospital are placed in serious jeopardy by the physician's action or conduct.

22.    Summary suspension where this is a violation of hospital policy or where the physician's conduct may be disruptive of the medical staff or hospital operations. These and other alternative grounds for summary suspension are no longer allowed.

23.    Plaintiff lawyer filed for reinforcement of judgment on Guam after the statute of limitation has been lapsed. (debt collection at North Carolina is 3 years).

24.    Plaintiff lawyer tried to enforce judgment at Guam which he was not aware about the defendant case and the law has not been followed. Even he tried to force subpoena prior to scheduling a meeting with the defendant for scheduling discovery and deposition. The plaintiff lawyer is non- compliant with due process. Defendant filed for motion to stay 62 (b)(3)(4) to protect his constitutional right for fair trial.

## CONCLUSION

For the above reasons, the defendant prays to the court to accept his motion.

Thank you,

**Sherif A. Philips, MD**
*1406 North Marine Corps Drive*
*Upper Tumon, GU 96913*
*Telephone: (671) 689-7611*
*Email: sherifap@aol.com*

Berman O'Connor & Mann
Received

SEP 1 4 2018

Time: 12:00 By: PT

## CERTIFICATE OF SERVICE

*The undersigned hereby certifies that he served a copy of the following*
**RULE 59 AND RULE 62** *on the opposing parties, this 14Th day of September addressed as follows:*

Daniel J. Berman, ESQ
Berman O'Connor & Mann
Suite 503, Bank of Guam Bldg
111 Chalan Santo Papa
Hagatna, GU 96910
Tel: (671) 477-2778
Facsimile: (671) 477-4366

FILED
SUPERIOR COURT
OF GUAM

2018 MAY 21  AM 10: 11

CLERK OF COURT

By:_____

1   DANIEL J. BERMAN, ESQ.
    BERMAN O'CONNOR & MANN
2   Suite 503, Bank of Guam Bldg.
    111 Chalan Santo Papa
3   Hagåtña, Guam 96910
    Telephone No.: (671) 477-2778
4   Facsimile No.: (671) 477-4366

5

6   Attorneys for Plaintiff:

7   *PITT COUNTY MEMORIAL HOSPITAL, INCORPORATED*

8             **IN THE SUPERIOR COURT OF GUAM**

9   PITT COUNTY MEMORIAL              CIVIL CASE NO. [ CV 0 4 7 8 - 1 8
    HOSPITAL, INCORPORATED,
10
                      Plaintiff,
11        v.                          **COMPLAINT FOR ENFORCEMENT OF**
                                      **JUDGMENT**
12  SHERIF ANTOUN PHILIPS, M.D.,
13                    Defendant.

14

15               **INTRODUCTION**

16        1.     This is an action to collect on the Judgment entered in the General Court

17  of Justice, Superior Court Division, for the County of Pitt in the State of North

18  Carolina, having the same effect as obtaining one in Guam for the purpose of

19  collecting money.

20        2.     Plaintiff Pitt County Memorial Hospital, Incorporated is a corporation

21  duly licensed and still doing business in the State of North Carolina.

22        3.     Defendant Sherif Antoun Philips, M.D., is a resident of Guam.

23               **JURISDICTION AND VENUE**

24        4.     Pursuant to 6 GCA § 4214, the Court has authority to pronounce the

25  Judgment entered in the Superior Court for the State of North Carolina as having the

26  same effect as a Judgment granted by the Superior Court of Guam.

27

28

\\SHARESERVER\share\wpdocs2\Dan\Pitt County Mem Hosp\PLDS 2018 05 May\Complaint for Enforcement of Judgment 05 17.doc

## FACTUAL CLAIMS

5.      Plaintiff herein was a Defendant in a suit filed in the General Court of Justice, Superior Court Division, for the County of Pitt in the State of North Carolina, File No. 09-CVS-2652, *Sherif A. Philips, M.D. v. Pitt County Memorial Hospital, Incorporated, et al.*

6.      The Superior Court for the State of North Carolina (the "Court") was and is, at and prior to the time of the institution of that cause, and is at this time a Court having jurisdiction over the subject case and parties.

7.      Judgment was entered by the Court in favor of Plaintiff against Defendant on August 8, 2016, for $444,554.45 of fees and $12,781.25 of costs for the total sum of $457,335.70, plus post-judgment interest at the rate of 8% Annual Percentage Rate or $100.24 per day after August 8, 2016 to the present. A true and correct copy of the Judgment is attached hereto and made a part herein as Exhibit "A".

8.      Plaintiff's lawsuit is initiated for the collection of monies owed to Plaintiff by Defendant. There is no defense to this action.

9.      No part of the Judgment recovered against Defendant described above has been paid.

10.     Defendant is on notice that Plaintiff, on the trial of this cause, will introduce in evidence a duly certified copy of the Judgment from File No. 09-CVS-2652, *Sherif A. Philips, M.D. v. Pitt County Memorial Hospital, Incorporated, et al.*, in the Superior Court for the State of North Carolina.

## RELIEF REQUESTED

WHEREFORE, Plaintiff requests that Defendant answer this Complaint for the relief herein:

1.      Plaintiff have Judgment against Defendant for the sum of $457,335.70;

2.      Interest thereon at the rate of $100.24 per day from August 8, 2016 until date of entry of Judgment;

- 2 -
\\SHARESERVER\share\wpdocs2\Dan\Pitt County Mem Hosp\PLDS 2018 05 May\Complaint for Enforcement of Judgment 05 17.doc

Case 1:18-cv-00046   Document 1   Filed 12/26/18   Page 53 of 56

1      3.     For reasonable attorneys fees,

2      4.     For costs of Court in this cause;

3      5.     For such other and further relief as the Court may deem just and

4  equitable.

5      DATED this ___ day of May, 2018.

6               **BERMAN O'CONNOR & MANN**

                  Attorneys for Plaintiff

7               *PITT COUNTY MEMORIAL HOSPITAL,*

               *INCORPORATED*

8

9         By:

10              DANIEL J. BERMAN

# Exhibit "A"

# FILED

SHERIF A. PHILIPS, M.D.,          )
           Plaintiff,          )
                           )
      v.                  )     **JUDGMENT FOR COSTS**
                           )     **AND ATTORNEYS' FEES**
PITT COUNTY MEMORIAL HOSPITAL,    )
INCORPORATED, PAUL BOLIN, M.D.,      )
RALPH WHATLEY, M.D., SANJAY        )
PATEL, M.D., and CYNTHIA BROWN,     )
M.D.,                              )
           Defendants      )

THIS MATTER came on for hearing before the undersigned Superior Court Judge Presiding, sitting by appointment of the Chief Justice, pursuant to Rule 2.1 of the General Rules of Practice for the Superior and District Courts, upon Defendants' Motion to Enforce and/or Clarify Order on Defendants' Amended Motion to Tax Costs and Motion for Attorneys' Fees;

AND, the Court, having reviewed the matters of record and having heard the arguments of counsel for Defendants and by Plaintiff, finds that Defendants' Motion is proper, and that the previously entered Order on Defendants' Amended Motion to Tax Costs and Motion for Attorneys' Fees be amended in accordance with this Judgment as follows:

1.      On July 17, 2014, the Court entered an Order on Defendants' Amended Motion to Tax Costs and Motion for Attorneys' Fees, in which the Court taxed costs in favor of Defendants and against Plaintiff in the sum of $12,781.25, and further ordered that Defendants have and recover from Plaintiff attorneys' fees in the amount of $444,554.45.

2.      The Court hereby adopts and incorporates herein all findings of fact and conclusions of law set forth in the July 17, 2014 Order on Defendants' Amended Motion to Tax Costs and Motion for Attorneys' Fees.

3.      The Court intended for the July 17, 2014 Order on Defendants' Amended Motion to Tax Costs and Motion for Attorneys' Fees to be a Judgment and to be enforced by judgment collection procedures.

EXHIBIT
**A**